05-3345, Vasily v. Department of the Treasury. Mr. Potash, and you've reserved three minutes for rebuttal? I'm going to try, but as I see things progressing this morning, I may have a shot at it. Okay. No, certainly go ahead. Whenever you're ready. Mr. Potash. May it please the Court, my name is Lester Potash, and I am here on behalf of James Vasily, who was found to have failed to properly process or secure some work of the Internal Revenue Service or taxpayer-related papers, and a result of that was found not to have any redeeming merit whatsoever, and it resulted in his being fired and banished from the Treasury and Internal Revenue Service. I'm listening. I'm just getting out of spot. After a long service, right? After a long meritorious service, something that would— But these things happen. It happens, I won't say all the time, but yes, it happens. It happens to people who have meritorious service, it happens to people who have been disciplined on prior occasions. It happens. But in this instance— What's the theory—let me put it to you this way. Assume for purposes of an argument, if a Treasury official of some degree of importance were found to have not processed a lot of work, to have sat on a bunch of refund checks, to sort of done all the things that were alleged here, then that would be misconduct that would call for some sort of punishment, right? Taking your premise, yes. And so—and whether the punishment was apt would depend, and its severity would depend on how the agency treated like people in the past. It would depend on whether the person was—you know, where they stood in life, it tends to be that the higher up the totem pole, the harder you get whacked because you're a leader and you're supposed to show—so am I to understand that the burden of your appeal here is to convince us that these alleged episodes of misconduct didn't occur? Is that what you're telling us? Well, primarily I want him to get his job back, and so I'm going to basically go to the dispositional aspect, but clearly the brief spends a great portion of the pages saying that, I don't know what happens, he doesn't know what happens, but there's no evidence to show that he had any connection to it. I mean, I don't know if that answers your question, but I'm going to try to get there. Yes, a portion of this is that the punishment meted out was inappropriate under the Douglas factors, under any factor. And so he should get his job back, and if you find that he did engage in misconduct, so be it. You may need to refresh my recollection a little bit about the record, and if so, I do apologize because I read the record carefully and I take seriously these cases where people with long patterns of distinguished service either stubbed their toe or something happened. But I recall in the facts that something that had troubled, I believe, the administrative judge was that your client was alleged to have fabricated some signatures and some documents in order to plead his case in his favor. Taking a deep breath, Your Honor, and responding to your question, I will tell you a couple years ago I tried a murder case where the husband was accused of killing his wife, shooting her, putting her in the trunk and leaving her abandoned in some location. Absolutely no evidence whatsoever, none, connecting any of those acts to the husband. He goes home, he starts to repaint the house, rip the carpet up, burn a headboard, does everything in the world that points to him and says, this looks very suspicious. And then he gets arrested, he's tried, and he gets acquitted because the underlying facts do not prove the murder. With all due respect, I'm trying to figure out why, we were trying to figure out why he undertook these acts. Why did he tear up the carpet, burn the headboard, paint the house, do all these other things? Nobody knows. Get a new mattress? Nobody knows. But there was no evidence connecting the murder, but the whole case was tried on those circumstances. In this instance, I can't explain why this took place. We had a deposition of three ladies, two of whom recognized this and said, yes, I must have signed this, I acknowledge signing this. In the hearing, they backed off and said, well, I'm not certain it's my signature. I don't know. And clearly, that is a red herring, that is a smokescreen, whatever the word de jure or phrase de jure is. But if you look at the underlying facts, you have no direct evidence, you have no forensic evidence. It's not like they took a piece of skin from one of the papers of the Internal Revenue Service and CSI matched it to my guy, and you don't have any circumstantial evidence. What you have is a circumstance. But the reason why I raised this was because it seemed to me that it played into the assessment on the penalty, was that if there was some sense by the fact finder that your client had engaged in less than completely honest conduct in the supplying of information to the decision maker as to what decision could be made, then if that were true, if there was any truth to that, it would seem to me that it would be a weight on the scale adverse to your client in terms of the penalty. I don't dispute that, if that were the case. But still, first of all, it doesn't merit him being fired, he being fired from the job. And secondly, that really, although it is mentioned, and no question she mentioned it, I think that a lot of her determination came from the fact that there was a three-page affidavit that she interpreted in some way that said, I did it. And that to me was also a means by which I think, again, you can look at a piece of paper and you've heard, being the last one I've had the benefit of listening to all the other arguments, and I've heard how things can be interpreted. Was there also, am I right in recalling that there was an element in the A.J.'s decision that dealt with your client's initial reaction when confronted with the concern that there was a considerable amount of unfinished business that had been left behind in the carrel when he went either upstairs or downstairs? As I recall, there was at least something in the record that said his initial response was, well, yes, I'm overworked, I was unable to get my work done. I'm very, very sorry. I realize that this could reflect poorly on the reputation of the Treasury, and I'm a long-term employee, and that hurts me as much as it hurts the Treasury. I'm very sorry. Correct. That was a three-page affidavit. He was interviewed by a TIGA agent, and then as a result of the interview with her over his shoulder, he writes this three-page affidavit. Some of the words were suggested by her, but it's in essence a mea culpa that I may have been behind in my work. Are you arguing that was coerced? I don't want to throw out the word coerced, because that's, you know, you have somebody with a gun standing over your shoulder saying, write this. Sometimes, I'm not saying it's coerced, but there are other circumstances that come into play. The bottom line is, even the TIGA agent said, these were my words. I added in her statement and in his affidavit, she editorialized incorrectly in some instances. In fact, she recorded some of her statements, especially of Suzanne Ray, were totally incorrect. But the bottom line is, is what he acknowledged was during the course of his being a lead CSR, he had other jobs and responsibilities that took him away from the immediate task at hand that he accomplished that caused him maybe to get a little behind in his regular work. And he apologized for that while he was doing other above and beyond. And everybody said, this guy went above and beyond. He worked during lunch. He came in on weekends. He did everything. But he... But again, tell me if I'm wrong, it seemed to me that the, from the three-page affidavit passed assumed for a moment that it was what your client meant to say, as opposed to coerced or written by somebody else. The explanation changed, as I understood him to be saying subsequently, no, no, no, that's not my fault. Somebody else, there's no chain of custody. Somebody else got in there and left all these checks that should have been processed. That's not on my nickel, he was saying. I think this is where some misunderstanding takes place. He had no knowledge. Remember, he's gone for 15 months. This is an office that was communal. Anybody and everybody who wanted that office used it. Well, there were some cabinets that were locked. I'm sorry? There were cabinets, file cabinets that were locked. And how did they open it up? Somebody went and got the key. It's not that he had the only key. They went and got the key to open it up when they were then searching his cubicle. So I'm saying it was... Well, right, but I mean, I didn't think there was any allegation that somebody got the key and unlocked the cabinet during the 19 months that they were using it as a storage place for birthday parties. Nobody, he has no idea what the piles of, whether it was a pile of paper, piles of paper all over the, he has no idea what these things were. All he said is... Right, and it struck me that a chain of custody, I'm not responsible argument is pretty, pretty I'm several miles apart from a mea culpa, I'm sorry, I got behind. I realized that this is bad and I'm sorry I did it. Mr. Potash, let me ask you, let me ask you this question. Assume for the moment that, and again, please assume the things, you might disagree with some of them as a fact, but assume number one, that Mr. Vasily, that's how you pronounce his name? Correct. Assume number one, that Mr. Vasily does acknowledge in this three-page affidavit that he had been derelict in the performance of his duties and he apologizes. Then assume, however, that he alters his story or changes his position. He says, no, I didn't do this, etc. And then we have a determination that the offense was committed and we turn to the penalty phase. Is it, in your view, proper or improper among the Douglas factors for the board to consider the fact that initially Mr. Vasily admitted it, assuming for the purpose of my question he did, but then change his tune, so to speak. Is that something properly, in your view, considered or not properly considered in assessing a penalty? Remorse is a criteria. So if you talk about remorse as being I admit and then I don't admit, then you can say, well, maybe he went back. So yes. The answer to your question is yes. Can I focus now on your... No, I understand. You're saying under those circumstances, yes, but you're saying that's not what we have here. I believe that's not what we have, but clearly, yes, because I think that remorse is a criteria listed and so if he says, I'm sorry, and then takes it back, I guess you can say, well, he's not as remorseful as he initially appeared to be. However, what was first acknowledged, never said, these were my papers. I was shown some documents of all the hundreds or thousands of pieces of paper. There was one item that might have appeared familiar to me. Maybe I recognize it. I don't... He never recognized, acknowledged ownership to any of the other. Secondly, the taking back, I didn't mean it, was my letter. My letter, and I was speaking in a more legalistic, formalistic tone, saying that, having read the affidavit, having spoken to Mr. Vassily, he never acknowledged this as being his, and we want to make sure he does not take responsibility for that he has no knowledge of, because he did not know... Again, in the three-page affidavit, there is no time where he says, this was my work and I'm sorry. He was never charged with that. He was charged with failing to properly process or secure things, not being slow to get his work done. Because obviously, if anybody who was slow to get his work done... I mean, if you have a bunch of checks that are supposed to be processed, I couldn't tell for sure whether they were checks that were going back to the taxpayer, like my refund, or whether they were checks coming in from somebody that owed some more money, but there's monies lying around in there, right? Well, your premise, as you stated, it is yes, but however, that's not what happened. If you remember, and if you read the statement of Glenn Ray, as well as the testimony of Suzanne Ray, first of all, there was minimal, if any, harm to a taxpayer. Well, regardless of the harm to the taxpayer or a harm to the FISC in not putting my tax check in the bank for the government, if there's sort of money lying around somebody's peril, right, and they come in and after somebody finds these checks, your theory is that the government has to prove that the person who used to occupy the knowledge personally knew the checks were there, and it was their responsibility to process them? Well, can't there be an inference drawn that if, let's assume you found $25 million worth of checks from taxpayers that were supposed to be put in the treasury bank account, and they found them in somebody who used to occupy Office A, and they'd gone, they've downstairs, and someone comes in a few months later and they find all these checks that were dated so that you knew they were there at the time that the person was sitting there, was supposed to be sitting there. Can an inference be drawn? The way you focus the question, and again, you do this so that the answer would have to be yes. However, if you apply it to the facts in this case, first of all, you're taking into assumption something that I believe may be an inappropriate assumption to take, and secondly, you talked about can't these checks, which we knew were there at the time the person occupied the cubicle, some of those checks were three years old. Now, he has been there for how many years? If you think for a moment that somebody who sent a check in 1999 didn't get credit in 2001, I don't bet anybody else, I'd be calling somebody. What happened to my credit? What happened to my check? What happened to this? What happened? Nobody ever called. Remember, not one taxpayer made an inquiry about the work, and in fact, if you heard the testimony from the supervisors, both Jankowski and Suzanne Ray and even Glenn Ray, some of these documents are processed and then they're dumped. We don't know whether these were active papers. These could have been, if you assume for the sake of discussion, which I believe is not a good assumption, but if you assume they're his, they could have been overdone with and all processed. Nobody knows. The problem is you have a circumstance, not circumstantial evidence. You have the circumstance of something being found 15 months after it gets transferred and all of a sudden, you got, he was here, it's found here, straight line. Mr. Potash, you're into your three minutes of rebuttal, but if necessary, we'll restore it. Ms. Conrad? Good morning. May it please the court, the MSPB's decision in this case should be affirmed because the misconduct charges against Mr. Vasily are supported by substantial evidence and his removal was a reasonable and proportionate disciplinary action. The agency's misconduct charges are supported by substantial evidence because all the unprocessed documents found at Mr. Vasily's workstation were dated before Mr. Vasily left for his temporary promotion. I believe they were all dated between January and May 2001 as having been received by the IRS. Is there evidence in the record that shows that those documents were within the zone of his influence or his assignment? Yes. There's testimony from both his supervisor at the time, Ms. Roberts, and Mr. Ray, who was another lead contact representative, that those are documents that a lead contact representative would work on. And also, there's testimony from- Well, would work on. Let's assume that there are three lead contractors sitting in a row, right, and they all work on the same kind of stuff, and for some reason, the mail delivery delivered to Mr. Vasily a bunch of work that belonged to Mr. Schall. Okay. Well, but there was only- Then, could Mr. Vasily be taxed with improper conduct for failing to execute Mr. Schall's work? I would think not. No. But there was only one- Mr. Vasily was the only lead contact. There wasn't three. There was only one for Ms. Roberts' work group, and- So, he was the sole recipient of work of this kind in the office. That's correct. And there is testimony to that effect. That's correct. And there's also testimony that he was only one of- he might have been the only one at the time, but I can't remember if it was only one or one of two people in that work group that was actually authorized to process checks because of his position as lead contact representative. And obviously, this office operates in such a way that nobody logs in what's coming in. That's correct. At this time- So, for all you know, there are other offices and coming- I mean, in the absence of somebody finishing their work, nobody would ever know, I guess, unless some taxpayer ended up calling ten years down the road when things were messed up. That's correct. I mean, there was only a date stamp when it was received, and it was assigned to certain work groups, but there was nothing that- you know, no log of what person was working on what at the time. But probably most significantly in this case is the fact that when Mr. Vasily was first discussed his position with the Treasury Inspector General, he admitted that he had fallen behind in his work, that he was unable to keep up with all the stuff that was assigned to him. And- Is it true that that affidavit was dictated by the boss? No. No, Your Honor. Her testimony is that she only helped him with the initial- the introductory paragraph, which says, you know, this affidavit was given this day, and- but that- the rest of it, he wrote himself. Your Honor, so you're focusing now on the penalty issue? You're saying that- Well, I'm saying- You're saying that this is- this is what we were discussing a little bit with Mr. Potash. You're saying that we're now in a situation where remorse as a factor in Mr. Vasily's favor is taken off the table. Yes. I mean, that's correct, Your Honor. I was addressing affidavit, though, as part of the evidence that those documents were his responsibility. Oh, I see. Okay. All right. But, yes. But to move to what you were just talking about, it was only after Mr. Vasily was threatened with removal that he submitted the letter that said he denied- categorically denied all- that any doc- that he left any unprocessed documents at his workstation in May 2001 when he left for his promotion. Do you read the administrative law judge to have made a credibility assessment of the record here? I realize the appellant didn't testify, and so there couldn't be a flat credibility- you know, the magic C word, which the government's always looking for because of the difficulty of upsetting a credibility ruling, but the- at page addendum 12, the administrative law judge wrote, the appellant's current claim of innocence is entirely incompatible with his affidavit, which he denies. Yes. Yes. I do see that as a credibility determination. I mean, she looked at the evidence in the record, and- Well, if that's so, then the switching of stories, if you will, if we can shorthand to give that a sobriquet, that would go to the merits of, did you do it? Did you engage in misconduct? As well as to the penalty issue. Yes. I believe that's true, Your Honor. And another thing she also considered were these documents that Mr. Vasily submitted for the first time before the MSPB, these notes that he allegedly wrote to supervisors in which he alleged that either certain people were placing documents on his workstation without his knowledge, or that he- I believe he has one document that says that he cleaned out his workstation and handed his keys to his supervisor. And the administrative judge properly found that these contained indications of falsification because not only did, at the hearing, they all testified that they didn't remember signing the documents, but on one, I believe Ms. Roberts' name is misspelled three different ways in her signature on these documents. So that is something else I believe the administrative judge considered in her determination. And turning to the removal issue, it was a reasonable and proportionate penalty. The- Mr. Bazic, the deciding official, testified at length that he considered all the Douglas factors, but especially noteworthy was his- the agency's lack of confidence in Mr. Vasily for failing to process these documents and not telling anyone about it, and also the a leadership position and set an example for the rest of his team. And, of course, I'm assuming this is well known what happened with this case. If there's not any more questions, we- for these reasons, we ask the court to affirm the decision of the Merit Systems Protection Board. Thank you, Ms. Conrad. Mr. Potash, you have your- you have your rebuttal. When I heard the use of the term substantial evidence, it again reminded me of a comment that was made in an earlier case about if you use illegally write language, it sort of bulletproofs any sort of review. Legally write language was used, but if that's all that counts, then obviously there's no reason for you guys to be here because your- the burden is to make sure that there is evidence that follows the legally write term of substantial evidence. And the point is, is what kind of barrier or what kind of hurdle is substantial evidence? It's not a speed bump. It's not like something that will get you indicted where all you got to do is do some sort of probable cause, a crime is committed, defendant committed a crime, and then you're indicted. It's not beyond a reasonable doubt, which would make it a hurdle, high hurdle, but there is some hurdle that you have to cross. And the point is, is that there has to be some examination, evaluation of all the evidence of record, not pieces and parts, to determine whether that hurdle was met. And I submit to you that that hurdle wasn't met because you have, again, speculation, you have supposition, you have innuendo, and you have some- a little bit of bizarre behavior. But if you take that aside and take a look at exactly what was proven, then all you have is the legally right term of substantial evidence and not the evidence that supports it. Well, you have a- laying aside your chain of custody argument, which is somebody else got in and tampered, you have documents that are assigned to your client in his zone of responsibility that are delivered to his office and then they're found in the office. I'm not certain that that is exactly correct. What you have is documents that may be processed by him or anybody else in Sabrina Roberts' group. Critical testimony is Glenn Ray, another lead CSR, who was asked, is there any way that you can say that Jim Vasley looked at this? Right, but according to your adversary, there were certain items of work that only he was permitted to do, and those items of work were found in the carer. That's what she says. There were checks. You remember, they brought in people from other- Right, but I mean if there is someone who gave an affidavit to that effect, then you need to cross-examine that person to prove they're not telling the truth, or you need to put your own client on the stand, don't you, to explain what happened. No, I'm saying that the testimony doesn't support that conclusion. The testimony supports that. Some work is done by a lead CSR, but not exclusively by this lead CSR. They had brought somebody else in from another unit who could do checks. They had other people that were doing work similar to Jim Vasley. That's the problem of this case. You have so many speculative issues here that there's nothing that says that you can actually funnel down and lay at his feet or on his doorstep. What you have is, it's on his desk there, Nancy Jankowski. Why is it that this is Jim Vasley's responsibility? We found it on his desk. That's the evidence. Why is this Jim Vasley's responsibility? He was the lead CSR. He's gone for 15 months, they hold lunches, parties, train people there, nobody sees the thousands of documents, nor Sabrina Roberts, who's the supervisor. Nobody sees these things. And then all of a sudden, mysteriously, these are Jim Vasley's documents, and this causes him to get fired? I would submit that maybe a jury, they didn't even have probable cause, because in the record it talks about the fact they preferred this for criminal charges. Potash, thank you. Oh, I apologize. No, no, that's fine. I wanted to let you finish your thought. The case is submitted. Okay, thank you very much.  Potash, I wanted to ask you, what did you do?